# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

ebm-papst Inc. and ebm-papst SEA Pte., Ltd.,

                Plaintiffs,

v.

AEIOMed, Inc.,

                Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 09-551 ADM/JJK

_____

Thomas J. Finn, Esq. and Paula Cruz Cedillo, Esq., Jorden Burt LLP, Simsbury, CT; and Arthur G. Boylan, Leonard Street and Deinard, PA, Minneapolis, MN, on behalf of Plaintiffs.

Terrance W. Moore, Esq., Steingart, McGrath & Moore, P.A., Minneapolis, MN, on behalf of Defendant.

_____

## I. INTRODUCTION

On September 23, 2010, the undersigned United States District Judge heard oral argument on Defendant AEIOMed, Inc.'s ("AEIOMed" or "Defendant") Motion for Summary Judgment[1] [Docket No. 108] and Plaintiffs ebm-papst Inc. ("ebm N.A.") and ebm-papst SEA Pte., Ltd.'s ("ebm Singapore") (ebm N.A. and ebm Singapore are collectively "ebm-papst" or "Plaintiffs") Motion for Summary Judgment [Docket No. 114]. For the reasons set forth below, Defendant's Motion is granted in part and denied in part, and Plaintiffs' Motion is denied.

---

[1] AEIOMed has referred to its Motion as both a "Motion to Dismiss" and a "Dispositive Motion." However, AEIOMed also states that its Motion was pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the sake of clarity, the Court will construe the Motion as one for summary judgment. AEIOMed also noted that portions of its Motion invoke Rule 702 of the Federal Rules of Evidence, as applied in <u>Daubert v. Merrell Dow Pharm.</u>, 509 U.S. 579 (1993). For sake of clarity, while not technically a separate motion, the Court will refer to those portions of AEIOMed's Motion as the "<u>Daubert</u> Motion."

## II. BACKGROUND[2]

AEIOMed manufactures medical devices, known as continuous positive airway pressure ("CPAP") machines, used to treat sleep apnea. Counterclaim [Docket No. 84] ¶ 6. Plaintiffs are related entities that manufacture "blowers," which are used as components in CPAP machines. Am. Compl. [Docket No. 41] ¶ 19. ebm N.A. typically makes and sells 24-volt blowers, but created a custom 12-volt blower for use by AEIOMed. Finn Decl. [Docket No. 145], Ex. B, ebm-papst Inc. 30(b)(6) dep. at 19. Initially, AEIOMed and ebm N.A. had no formal agreement; rather, AEIOMed would order a batch of custom 12-volt blowers and would pay $47.60 per blower. Beckwith Aff. [Docket No. 147] ¶ 6. ebm N.A. would then confirm the purchases using invoices. See Beckwith Aff., Ex. 2 (examples of pre-contract invoices). To reduce their costs, AEIOMed approached ebm N.A. about discounted prices for high volume purchases of blowers. Finn Decl., Ex. D, Fleischhacker Dep. at 80.

On August 22, 2006 AEIOMed and Plaintiffs entered into a written agreement (the "Agreement") that Plaintiffs would supply custom blowers to AEIOMed. Am. Compl. ¶ 7. The Agreement itself does not set forth a specific number of blowers to be purchased. See Beckwith Aff., Ex. 1. Rather, the Agreement provides increasing price discounts corresponding to increasing purchase volumes. Id. For example, the Agreement provides a per unit price of $38.95 for a purchase of 75,000 units. Id. The Agreement states that 75,000 units is the "forecast" quantity between October 2006 and March 2008. Id. The Agreement also states that it "applies to P.O. [Purchase Orders] 1032 (a,b,c)." Id. Purchase Order 1032A states, in relevant

---

[2] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). As both parties have moved for summary judgment, any disputed facts are noted.

part, "[t]his is the initial shipment of the 75,000 with balance to be delivered in periodic shipments through March 31, 2008." Beckwith Aff., Ex. 3. All subsequent purchase orders and invoices list $38.95 as the price for blowers. See id. The Agreement contains no integration clause stating that the Agreement is the entire contract between the parties.

After entering into the Agreement, AEIOMed sent several purchase orders to Plaintiffs for blowers. See id. AEIOMed used a series of purchase orders beginning with the number 1032 followed by the letters A through F (the "1032 series") to order blowers from ebm N.A. Id. AEIOMed used a series of purchase orders with a number between 1500 and 1599 (the "1500 series") to order blowers from ebm Singapore. Beckwith Aff., Ex. 4. Both ebm N.A. and ebm Singapore sent invoices back to AEIOMed after receiving purchase orders. Beckwith Aff., Exs. 5, 6. The invoices sent by ebm N.A. contained a variety of additional contract terms on their reverse side. See Beckwith Aff., Ex. 5. Among these terms is a provision purporting to shift liability for ebm N.A.'s attorney's fees to AEIOMed. Id. AEIOMed has offered evidence that no one with contract authority at AEIOMed ever saw or agreed to the terms on the back of the invoice. 2d Fleischhacker Aff. [Docket No. 156] ¶ 13. For its part, ebm N.A. has offered evidence that it is common practice in the industry to include such terms on the back of invoices. Beckwith Aff. ¶ 12.

AEIOMed ordered about 20,000 blowers that were delivered, accepted, and incorporated into CPAP machines that then entered the marketplace. See 2d Fleischhacker Aff. ¶ 4. Beginning in the fall of 2007, AEIOMed began receiving returned CPAP machines from customers complaining that their machines had failed. Fleischhacker Aff. [Docket No. 135] ¶ 2. AEIOMed investigated, but was told by ebm-papst to return intact any CPAP machines with

part, "[t]his is the initial shipment of the 75,000 with balance to be delivered in periodic shipments through March 31, 2008." Beckwith Aff., Ex. 3. All subsequent purchase orders and invoices list $38.95 as the price for blowers. See id. The Agreement contains no integration clause stating that the Agreement is the entire contract between the parties.

After entering into the Agreement, AEIOMed sent several purchase orders to Plaintiffs for blowers. See id. AEIOMed used a series of purchase orders beginning with the number 1032 followed by the letters A through F (the "1032 series") to order blowers from ebm N.A. Id. AEIOMed used a series of purchase orders with a number between 1500 and 1599 (the "1500 series") to order blowers from ebm Singapore. Beckwith Aff., Ex. 4. Both ebm N.A. and ebm Singapore sent invoices back to AEIOMed after receiving purchase orders. Beckwith Aff., Exs. 5, 6. The invoices sent by ebm N.A. contained a variety of additional contract terms on their reverse side. See Beckwith Aff., Ex. 5. Among these terms is a provision purporting to shift liability for ebm N.A.'s attorney's fees to AEIOMed. Id. AEIOMed has offered evidence that no one with contract authority at AEIOMed ever saw or agreed to the terms on the back of the invoice. 2d Fleischhacker Aff. [Docket No. 156] ¶ 13. For its part, ebm N.A. has offered evidence that it is common practice in the industry to include such terms on the back of invoices. Beckwith Aff. ¶ 12.

AEIOMed ordered about 20,000 blowers that were delivered, accepted, and incorporated into CPAP machines that then entered the marketplace. See 2d Fleischhacker Aff. ¶ 4. Beginning in the fall of 2007, AEIOMed began receiving returned CPAP machines from customers complaining that their machines had failed. Fleischhacker Aff. [Docket No. 135] ¶ 2. AEIOMed investigated, but was told by ebm-papst to return intact any CPAP machines with

defective blowers to ebm-papst for examination. 2d Fleischhacker Aff. ¶ 5. When processing returns, AEIOMed's procedure is to complete a "Failure Analysis Work Sheet" ("FAWS") upon an inspection of the CPAP machine to determine which component failed. Finn Decl. Ex. 6, Def.'s Resps. & Objections to Pls.' First Set of Interrogs. at 7-8.

Currently, AEIOMed's CPAP machines made with ebm-papst blowers have experienced a field return rate of 1.48%. Moore Aff., Ex. K, Lonky Report at 28. In January 2007, as a result of the returns, AEIOMed placed a hold on all blower orders from ebm-papst. 2d Fleischhacker Aff. ¶ 7. AEIOMed then brought the problems to ebm-papst's attention and resumed placing orders. See Moore Aff., Ex. V (discussion of returns between AEIOMed and ebm-papst).

As the returns continued, AEIOMed decided to conduct a "burn-in program." 2d Fleischhacker Aff. ¶ 9. The "burn-in program" consisted of operating CPAP machines for twenty-four hours prior to shipment. Id. The results of that test were a 1.57% failure rate of blowers. Id. AEIOMed's further testing revealed that most failures were due to problems with blowers' magnets or bearings. Moore Aff., Ex. M, Hanke Report at 6-10. Additionally, AEIOMed recently became aware of late-stage failure of blower impellers. 2d Fleischhacker Aff. ¶ 3.

In late 2007, AEIOMed stopped paying for blowers and refused further delivery of blowers from ebm-papst. See Am. Compl. ¶¶ 8-18; Beckwith Aff. ¶ 14. AEIOMed had four outstanding purchase orders. Two, 1032F with ebm N.A. and 1514 with ebm Singapore, have been partially paid. Am. Compl. ¶¶ 11, 15. Plaintiffs claim the blowers from these orders have been accepted and used by AEIOMed. Plaintiffs have produced invoices for these units. Beckwith Aff., Exs. 5, 6. With respect to the two other purchase orders, it is undisputed that the

4

units were ordered but that delivery was refused.  Beckwith Aff. ¶ 14.

In June 2010, AEIOMed became the subject of an audit by the Food and Drug Administration (the "FDA"), which regulates the sale of CPAP machines.  2d Fleischhacker Aff. ¶ 11.  During the course of the audit, AEIOMed agreed to no longer sell CPAP machines that incorporate blowers manufactured by ebm-papst.  Id.

Plaintiffs filed this action in federal district court in Connecticut.  Defendant moved to transfer the case to Minnesota, which was granted.  In preparation for trial, Plaintiffs hired Dr. Martin Lonky ("Dr. Lonky") of National Techincal Systems ("NTS") to conduct testing of AEIOMed's CPAP machines.  NTS conducted five tests at its facilities in Fullerton, California and Boxborough, Massachusetts.  Moore Aff., Ex. K, Lonky Report at 2.  Dr. Lonky's final written report concludes that AEIOMed's CPAP machine failure may have been caused by blocked air filters.  Moore Aff., Ex. K, Lonky Report at 30.  However, AEIOMed claims that several discrepancies are present between the data in the test log and the data in the final written report with respect to one of the five tests, known as "Test X."

All parties have brought motions before the Court.  Plaintiffs move for partial summary judgment, seeking judgment in their favor on breach of contract, attorney's fees, and prejudgment interest.  AEIOMed also moves for partial summary judgment, seeking judgment in its favor on attorney's fees and Plaintiffs' promissory estoppel claims.  Additionally, AEIOMed's motion seeks to exclude testimony by Dr. Lonky pursuant to Daubert v. Merrell Dow Pharm., 509 U.S. 579 (1993).

## III. DISCUSSION

**A.     Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig, 54 F.3d at 470. The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.     Breach of Contract**

Plaintiffs move for summary judgment on their breach of contract claims, the first count and second count of their Complaint, arguing that the undisputed facts establish breach by AEIOMed.

**1. Choice of law**

The parties dispute whether Minnesota law or Connecticut law properly applies to this dispute. Choice of law decisions ought to be the first order of business for courts presiding over a diversity case. Quaker Alloy Casting Co. v. Gulfco Indus, Inc., 686 F. Supp. 1319, 1326 (N. D. Ill. 1988). However, both Minnesota and Connecticut have adopted the Uniform Commercial Code (the "UCC"). Minn. Stat. ch. 336; Con. Gen. Stat. tit. 42a. Furthermore, Minnesota has

stated a preference for adopting law relating to the UCC from other jurisdictions in order to maintain uniformity. See Minn. Stat. § 645.22 (stating that uniform laws adopted by Minnesota should be interpreted and construed to effect uniformity with other states). Article 2 of the UCC applies here as the parties' contract is a transaction in goods. Minn. Stat. § 336.2-102; Con. Gen. Stat. § 42a-2-102. Therefore, with both states having adopted the UCC, no conflict of law exists and the choice of law issue need not be decided. Instead, the Court will draw freely from jurisdictions adopting the UCC.

### 2. The Agreement is an Installment Contract

The parties assert that the Agreement "governs" their relationship. However, whether the Agreement, or any other action by the parties, created a legally enforceable contract raises a question of fact. See Minnesota Supply Co. v. Raymond Corp., 472 F.3d 524, 532 (8th Cir. 2006) ([T]he existence of a contract is a question of fact . . . ."). Likewise, the construction of contract terms, if ambiguous, is a question of fact. Thomsen v. Famous Dave's of America, Inc., 606 F.3d 905, 911 (8th Cir. 2010). On the other hand, the construction of unambiguous contract terms and their legal effect are questions of law. M.M. Silta, Inc. v. Cleveland Cliffs, Inc., 616 F.3d 872, 877 (8th Cir. 2010).

At issue is whether the parties are bound by an installment contract. An installment contract is a contract with terms that call for delivery of goods in separate lots to be separately accepted. Minn. Stat. § 336.2-612; Con. Gen. Stat. § 42a-2-612. As such, the existence of an installment contract is determined by giving legal effect to the contract terms. Contract terms may be contained in multiple writings that form a single contract if the parties so intended. Paglin v. Saztec Intern., Inc., 834 F. Supp. 1184, 1192 (W.D. Mo. 1993). The parties' intent is

7

revealed by the surrounding circumstances.  Id.

The circumstances surrounding the actions of the parties suggest they intended to be bound by an installment contract for 75,000 blowers at a price of $38.95 per blower.  AEIOMed, ebm N.A., and ebm Singapore entered into the Agreement, which sets forth pricing at various quantities of blowers and indicated a "forecast" quantity of 75,000 blowers.  Beckwith Aff., Ex. 1.  The pricing scheme specified that a purchase of 75,000 blowers would be at a cost of $38.95 per blower.  Id.  The Agreement also noted that it was executed in reference to purchase orders "1032 (a,b,c)."  Id.  Purchase Order 1032A expressly states that AEIOMed would purchase 75,000 blowers.  Beckwith Aff., Ex. 3.  Thereafter, for the entire 1032 and 1500 series, AEIOMed was charged $38.95 per blower by both ebm N.A. and ebm Singapore.  Beckwith Aff., Exs. 5, 6.  Therefore, the actions of the parties unequivocally show that they intended that AEIOMed would purchase 75,000 blowers at a price of $38.95 per blower to be delivered in installments.  The parties are found to have created an installment contract as a matter of law.

### 3.  Genuine Fact Issue Exists as to Whether Blower Defects Substantially Impaired the Value of the Contract

Because the parties are subject to an installment contract, the buyer may not reject a delivery of nonconforming goods unless the nonconformity substantially impairs the value of the installment and cannot be cured.  Minn. Stat. § 336.2-612(2); Conn. Gen. Stat. § 42a-2-612(2).  For goods already accepted, acceptance may be revoked due to nonconformity if the nonconformity substantially impairs the value.  Minn. Stat. § 336.2-608(1); Conn. Gen. Stat. § 42a-2-608(1).  Further, the buyer may only repudiate the entire contract if the nonconformity of the goods substantially impaired the value of the entire agreement.  Minn. Stat. § 336.2-612(3); Conn. Gen. Stat. § 42a-2-612(3).  Whether there has been substantial impairment of the entire

8

contract is typically a question of fact.  Bill's Coal Co. v. Board of Pub. Utils., 887 F.2d 242, 247 (10th Cir. 1989).  Substantial impairment is evaluated from the perspective of *the buyer*.  Ford Motor Credit Co. v. Harper, 671 F.2d 1117, 1122 (8th Cir. 1982) (emphasis added).

A genuine issue exists as to whether the value of the contract between the parties was substantially impaired by the defects in the blowers.  Plaintiffs argue that the blower defects, if any, cannot constitute substantial impairment as a matter of law because the evidence establishes that only 1.48%, at most, of blowers were defective.  In the instant case, however, the defect rate is only one consideration.  AEIOMed argues that the contract between the parties was substantially impaired because (1) the cost of returns reduced the value of the contract, (2) blower failures led to an agreement with the FDA to no longer sell CPAP machines made with Plaintiffs' blowers, and (3) 1.48% is an unacceptable failure rate in the medical device industry.

AEIOMed has offered evidence that its total costs, including costs already incurred and estimated future costs, resulting from a 1.48% failure rate of its sold CPAP machines are approximately $375,000.  2d Fleischhacker Aff. ¶ 10.  Essential to that analysis is that the defects at issue are latent.  AEIOMed cannot know which blower units will fail before it incorporates them into a CPAP, the CPAP is sold, the CPAP fails due to a bad blower, and the machine is then returned.  AEIOMed has presented evidence that past and future returns of CPAP machines will cost the company $375,000.  A reasonable juror could find that sum to be a substantial impairment of the value of the contract between the parties.

Furthermore, AEIOMed alleges that the FDA will no longer allow sale of CPAP machines with Plaintiffs' blowers due to high failure rate.  See 2d Fleischhacker Aff. ¶ 11. Assuming this is true for the purposes of Plaintiffs' summary judgment motion, a reasonable

9

juror could certainly find that the agreement with the FDA substantially impaired the value of the Agreement. Indeed, the FDA accord caused more than two-thirds of the Agreement to cease to have any value to AEIOMed.

Finally, AEIOMed has presented evidence, in the form of expert opinion, that 1.48% is an unacceptable failure rate in the medical device industry. Moore Aff., Ex. BB, Sorenson Rep. at 3-4. All products are subject to *some* failure; however, if AEIOMed's products fail at a noticeably higher rate than its competitors, it harms AEIOMed's reputation. A harmed reputation, in turn, would reduce the value of the contract between the parties by reducing sales of CPAP machines. Therefore, given the opinion of Sorenson that a 1.48% failure rate is unacceptable in the industry, a reasonable juror could find that the value of the contract was substantially impaired.

**C.     Prejudgment Interest**

Plaintiffs also move for summary judgment on the issue of prejudgment interest. Plaintiffs argue that Connecticut law entitles them to ten percent annual interest on any judgment ultimately awarded under Con. Gen. Stat. § 37-3a(a). Defendant did not respond to this argument in its opposition memorandum. Minnesota law also provides for ten percent annual interest for any judgment over $50,000. Minn. Stat. § 549.09, subd. 1. The amount in controversy alleged in the Complaint is over $75,000. Compl. ¶ 4. At first blush, therefore, it seems that no conflict of law exists and Plaintiffs are plainly entitled to 10% annual interest. However, because liability and damages remain to be determined and because AEIOMed's counterclaims present the possibility of an offset, what prejudgment interest rate to apply must await the damage assessment.

**D.     Attorney's Fees**

With respect to attorney's fees, ebm N.A. claims it is entitled to an award of its attorney's fees should it prevail. Both ebm N.A. and AEIOMed have moved for summary judgment on this issue.

In general, each party is liable for its own attorney's fees, unless otherwise provided by statute or allocated by contract. Borntrager v. Central States Se. & Sw. Areas Pension Fund, 577 F.3d 913, 924 (8th Cir. 2010). Article 2 of the UCC does not shift liability for attorney's fees; therefore, ebm N.A. is entitled to payment of its attorney's fees by AEIOMed only if liability is shifted pursuant to a valid contract. As discussed above, the Agreement is not the entire contract between the parties. Instead, the Agreement referenced the purchase orders sent by AEIOMed. Those purchase orders contained additional terms, such as the terms stating that 75,000 units would be purchased. In response to those purchase orders, ebm N.A. and ebm Singapore sent AEIOMed invoices that also had additional contract terms. The invoices sent by ebm N.A. contained terms on the reverse side that purport to shift liability for ebm N.A.'s attorney's fees to AEIOMed. The issue, therefore, is whether these terms became part of the contract between AEIOMed and ebm N.A.

The UCC establishes that the terms on ebm N.A.'s invoices will become part of the contract between the parties unless (1) AEIOMed expressly limited acceptance of terms, (2) the terms materially alter the parties' agreement, or (3) AEIOMed previously objected to the terms or objected within a reasonable time after notice. Minn. Stat. § 336.2-207(2); Con. Gen. Stat. § 42a-2-207(2). It is undisputed that AEIOMed never expressly limited terms nor did AEIOMed object prior to the start of this litigation. Therefore, the only issue is whether the attorney's fees

terms materially alter the agreement between the parties. Material alteration occurs when an addition would result in surprise or hardship if incorporated without the express awareness of the other party. Coosemans Specialties, Inc. v. Gargiulo, 485 F.3d 701, 708 (2d Cir. 2007). Surprise has both subjective and objective elements: actual surprise must occur and it must appear that a reasonable merchant would not have consented to the additions. Id.

Material alteration is a question of fact to be analyzed in light of the particular facts and circumstances of each case. N & D Fashions, Inc. v. DHJ Indus., Inc., 548 F.2d 722, 726 (8th Cir. 1976). Plaintiffs argue that attorney's fees should not constitute a material alteration *as a matter of law* and cite several cases applying New York law. A closer reading of those cases, however, shows that each case is highly fact dependent, especially where there is a lack of evidence of subjective surprise. See Coosemans, 485 F.3d at 108 ("[D]efendants failed to offer any evidence to demonstrate either objective or subjective surprise . . . ."); Top Banana, L.L.C. v. Dom's Wholesale & Retail Ctr., Civ. No. 04-2666, 2005 WL 1529736, *5 (S.D.N.Y. June 28, 2005) ("Defendants have failed to offer any evidence to demonstrate either their objective or subjective surprise as to the subject terms of the invoices."); Serge Dore' Selections Ltd. v. Universal Wines and Spirits, No. 23509/2007, 2008 WL 2796868, *12 (N.Y. Sup. Ct. June 25, 2008) ("The Court found that defendants failed to offer any evidence to demonstrate either objective or subjective surprise over the attorneys' fee provision in plaintiffs' invoices."). Similarly here, the Court will not adopt any per se rule and will examine the particular facts and circumstances of this case.

Given the specific factual context of this case, the attorney's fees terms on the invoice are a material alteration of the terms of the contract between the parties. AEIOMed has offered

evidence indicating its subjective surprise to the terms. 2d Fleischhacker Aff. ¶ 13. Further, no evidence has been adduced that it is common industry practice for buyers to be liable for sellers' attorney's fees and costs. To be sure, ebm N.A. has presented evidence that it is common practice to attempt to shift liability by including these terms on invoices. See Beckwith Aff. ¶ 12. However, the evidence of record does not show that such terms become contractually enforceable or that AEIOMed should have expected them. To the contrary, the evidence of record shows that attorney's fees provisions were never negotiated or discussed. Moore Aff., Ex. Q, Beckwith Dep. 34-35. Absent any evidence of industry practice, liability for attorney's fees is an objective surprise. It is very doubtful that shifting liability for the substantial amounts of money typically spent on legal fees would be agreed to by a reasonable person without discussion. Therefore, the terms shifting liability for attorney's fees constitute a material alteration and do not become part of the contract terms. AEIOMed is entitled to summary judgment with respect to attorney's fees, and therefore ebm N.A. is responsible for its own attorney's fees.

**E.     Promissory Estoppel**

AEIOMed moves for summary judgment on Plaintiffs' promissory estoppel claims. At oral argument, Plaintiffs' counsel conceded to summary judgment. As such, AEIOMed's motion for summary judgment with respect to the Fifth Count and Sixth Count of the Amended Complaint is granted.

**F.     Daubert Motion**

In addition to its Summary Judgment Motion, AEIOMed brings a motion to exclude the testimony of Plaintiffs' expert witness, Dr. Lonky. Rule 702 of the Federal Rules of Evidence

governs the introduction of testimony by expert witnesses. See Fed. R. Evid. 702. In general, courts may allow expert testimony only when such testimony is both relevant and reliable. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 590-91 (1993). The rule favors admissibility over exclusion, but the proponent of the expert testimony must prove admisibility by a preponderance of the evidence. Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001).

**1. Reliability**

Dr. Lonky's testimony is sufficiently reliable. Courts analyze reliability from a flexible standpoint, examining the particular facts of each individual case. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999). Factors to be considered are whether the theory or technique can be or has been tested, whether it has been subject to peer review and publication, and whether the theory or technique is generally accepted with the relevant scientific community. Id.

AEIOMed moves to exclude Dr. Lonky's testimony on the basis that it is unreliable. AEIOMed argues that Dr. Lonky's conclusions regarding the failure of blowers has not been tested, has not been subject to peer review or publication, and is generally unreliable due to unscientific methods, such as falsifying data and ignoring data. For their part, Plaintiffs argue that Dr. Lonky's methods are generally accepted, and while his conclusion were not subject to peer review or publication, his conclusions have been rigorously tested.

AEIOMed's arguments are unpersuasive. First, Dr. Lonky's theories have been tested. His conclusions are based on a series of five tests. Moore Aff., Ex. K, Lonky Report at 2. The record indicates that Dr. Lonky performed his tests in accordance with the American Association

for Laboratory Accreditation standards for forensic reliability testing. Finn Decl., Ex. 4, Lonky Dep. at 30. Therefore, the evidence of record is that Dr. Lonky's tests were performed in a manner accepted as reliable by the forensic testing community. Next, AEIOMed argues that Dr. Lonky ignored data, the FAWS reports, in reaching his conclusions. However, the evidence of record is that Dr. Lonky was within the bounds of acceptable scientific method in ignoring FAWS reports, even AEIOMed's expert agreed that such reports were properly ignored. Finn Decl., Ex. 12, Sorenson Dep. 153-60. AEIOMed further argues that Dr. Lonky falsified data. AEIOMed points to several discrepancies between Dr. Lonky's written report and the test log. While the discrepancies are likely fodder for cross examination, they do not form the basis for exclusion. The test log is cryptic and nearly illegible. Therefore, it is likely that any discrepancies are the result of typographical errors or varied interpretation, as urged by ebm-papst. Further, Dr. Lonky's conclusions are based on a series of tests. At best, the discrepancies cast doubt only on portions of one of those tests. The Court is unwilling to say that the entirety of Dr. Lonky's testimony would be unreliable as a result.

### 2. Relevance

AEIOMed claims that Dr. Lonky's testimony would not be relevant because it does not mirror the facts of this case. Specifically, AEIOMed claims that because Dr. Lonky did not produce any "fried" motors or consider manufacturing defects his testimony is irrelevant. AEIOMed reads relevance too narrowly. Dr. Lonky conducted tests on AEIOMed CPAP machines that incorporated ebm-papst blowers. Those devices are the devices at issue in this action. Therefore, Dr. Lonky's testimony is relevant and will not be excluded.

15

## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [Docket No. 108] is **GRANTED IN PART** and **DENIED IN PART**, and Plaintiffs' Motion for Summary Judgment [Docket No. 114] is **DENIED**.

BY THE COURT:


    s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  November 15, 2010.